UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARISOL FLORES                    :
                                  :
V.                                :   CIV. NO.  3:09CV1829(JCH)
                                  :
MICHAEL J. ASTRUE,                :
COMMISSIONER OF SOCIAL            :
SECURITY                          :

RECOMMENDED RULING ON CROSS MOTIONS

I.   INTRODUCTION

Marisol Flores brings this action under Section 205(G) of
the Social Security Act, 42 U.S.C. § 405(g), seeking review of a
final decision of the Commissioner of Social Security that she
was not entitled to Disability Insurance Benefits under Title XVI
of the Social Security Act.

For the reasons discussed below, plaintiff's Motion for an
Order Reversing the Decision of the Commissioner **[Doc. #12]** is
**DENIED,** plaintiff's Motion for an Order to Remand to Agency **[Doc.
#13]** is **DENIED** and defendant's Motion to Affirm the Decision of
the Commissioner is **[Doc. #18]** is **GRANTED.**

II.   ADMINISTRATIVE PROCEEDINGS

Plaintiff filed an application for Disability Insurance
Benefits ("DIB") and Supplemental Security Income ("SSI") in
March 2006.  (Tr. 125, 130).  After this application was denied
initially and on reconsideration, plaintiff requested a hearing
before an administrative law judge ("ALJ").  (Tr. 61, 63, 64, 21,

1

76).  At the hearing, plaintiff amended her alleged onset date of disability to March 3, 2005, and formally withdrew her DIB claim due to the fact that her insured status had lapsed on June 30, 1991[1].  (Tr. 24, 116, 117, 145).  On February 11, 2009, following the requested hearing, the ALJ issued an unfavorable decision.  (Tr. 10).  The ALJ's decision became the final decision of the Commissioner of Social Security when the Appeals Council denied plaintiff's request for review.  (Tr. 1).  This case is now ripe for review under 42 U.S.C. § 405(g).

III.  STANDARD OF REVIEW

The scope of review of a social security disability determination involves two levels of inquiry.  The court must first decide whether the Commissioner applied the correct legal principles in making the determination.  Next, the court must decide whether the determination is supported by substantial evidence.  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971); Yancey v. Apfel, 145 F.3d 106, 110 (2d Cir. 1998).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  Gonzales v.

---

[1] To be eligible for DIB, a claimant must have disability insured status in the first full month in which he became disabled.  20 C.F.R. § 404.131.

2

_Apfel_, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); _Rodriques v. Califano_, 431 F. Supp. 421, 423 (S.D.N.Y. 1977).  The court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  _Dotson v. Shalala_, 1 F.3d 571, 577 (7th Cir. 1993).  The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  In reviewing an ALJ's decision, the court considers the entire administrative record, including new evidence submitted to the Appeals Council following the ALJ's decision.  _Perez v. Chater_, 77 F.3d 41, 46 (2d Cir. 1996).  The court's responsibility is always to ensure that a claim has been fairly evaluated.  _Grey v. Heckler_, 721 F.2d 41, 46 (2d Cir. 1983).

Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold the ALJ's decision "creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles."  _Schaal v. Apfel_, 134 F.3d 496, 504 (2d Cir. 1987) (quoting _Johnson v. Bowen_, 817 F.2d 983, 986 (2d Cir. 1987)).  To enable a reviewing court to decide whether the determination is supported by substantial evidence, the ALJ must set forth the crucial factors in any determination with sufficient specificity.  _Ferraris v. Heckler_, 728 F.2d 582, 587 (2d Cir. 1984).  Thus, although the ALJ is free to accept or

reject the testimony of any witness, a finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible review of the record. Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988). Moreover, when a finding is potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding. Peoples v. Shalala, 1994 WL 621922, at *4 (N.D. Ill. 1994); see generally Ferraris, 728 F.2d at 587.

IV. ELIGIBILITY FOR BENEFITS

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims. In essence, the Commissioner must find a claimant disabled if he determines "(1) that the claimant is not working, (2) that he or she has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the

4

regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in her prior type of work, and (5) there is not another type of work the claimant can do." Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); see also Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); 20 C.F.R. §§ 404.1520(b-f), 416.920(b-f).

The burden of proving initial entitlement to disability benefits is on the claimant. Aubeuf v. Schweiker, 649 F.2d 107, 111 (2d Cir. 1981). The claimant satisfies this burden by showing that impairment prevents return to prior employment. Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983). The burden then shifts to the Commissioner, who must show that the claimant is capable of performing another job that exists in substantial numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

V.    FACTUAL BACKGROUND

Plaintiff was 36 years old on her alleged onset date of disability, March 3 2005, and 40 years old when the ALJ denied her application for Social Security Income. (Tr. 26). She has an eighth grade education with some training in data entry/computers (Tr. 38, 153-54). Plaintiff has alleged disability due to scoliosis, radiating back pain, carpal tunnel syndrome, asthma, anxiety and depression.

A.  <u>SUBSTANTIAL EVIDENCE</u>

1.  <u>Medical Evidence</u>

X-rays taken of plaintiff's thoracic and lumbar spine in March 2004, one year before her alleged onset date of disability, revealed a reversed S-shaped scoliosis of her dorsolumbar spine. (Tr. 286).  Cervical spine X-rays, taken in response to plaintiff's complaints of numbness and tingling in her hands, showed no bony, articular or contiguous soft tissue abnormalities.  (Tr. 281, 285).

The following month, plaintiff underwent a physical examination with Adrienne Burns, a physician's assistant ("PA-C") at the Charter Oak Health Center.  (Tr. 231-33).  PA-C Burns reported that plaintiff had numbness in her fingers with bent, dangling wrists, which PA-C Burns attributed to carpel tunnel syndrome.  (Tr. 233).  Plaintiff also tested positive at forty-five degrees bilaterally on the straight leg raise.  (Tr. 233). PA-C Burns noted that plaintiff's deep tendon reflexes were 2+ bilaterally in both her upper and lower extremities and that her muscle strength was 4/5 bilaterally in both the upper and lower extremities.  (Tr. 233).  Plaintiff exhibited normal toe walking and tandem gait.  (Tr. 233).

On March 2, 2005, plaintiff underwent a lumbosacral MRI, which showed a small central disc protrusion at L4-5 with evidence of an annular tear and posterior degenerative changes

resulting in mild central stenosis. (Tr. 216). Plaintiff
returned to PA-C Burns for further treatment in April 2005, at
which time she rated her pain at a "4" on a 0-10 scale. (Tr.
226). PA-C Burns noted that plaintiff had missed an appointment
with an orthopedic doctor. Id. PA-C Burns observed diffuse
lumbar tenderness and noted that plaintiff's patellar tendon
reflexes were 3+/=. Id. She prescribed plaintiff Neurontin at
300mg and Celebrex at 100mg. Id. In July 2005, PA-C Burns again
examined plaintiff, who rated her pain at a "9" on the 0-10 scale
and complained of muscle tightness in her upper back and neck.
(Tr. 224). PA-C Burns recommended that she take Flexeril, which
plaintiff declined. Id. PA-C Burns also scheduled plaintiff for
an appointment with an orthopedist in August 2005 to address her
lumbar disc disease. Id. Subsequent notes from September 2005
indicate that plaintiff missed that appointment. (Tr. 223).

In December 2005, plaintiff underwent a physiatric
examination Steven Beck, M.D. (Tr. 217-18). Dr. Beck observed
that plaintiff displayed tenderness to palpation in her coccyx
region and at L4-5 and L5-S1; that she had multiple trigger
points; that she tested positive on the straight leg raise at
forty-five degrees; and that she ambulated with a slight list
toward the left side. (Tr. 218). However, he also reported that
plaintiff's strength was 5-/5 in both her upper and lower
extremities; that her reflexes were 2+ and symmetric; and that

she had intact sensation in upper extremities. Id. Dr. Beck
further noted that plaintiff's complaints of patchy distribution
of sensory loss in her lower extremities did "not correspond to
any specific dermatome, or peripheral nerve distribution." Id.
Dr. Beck assessed Plaintiff as having mid and low back pain,
multiple areas of muscle tenderness, restricted thoracolumbar
extension, and tight lower extremity musculature. Id. He
recommended that she avoid repetitive lumbar extension and that
she undergo a course of outpatient physical therapy two to three
times a week for six weeks. Id.

Records from Hartford Hospital indicate that plaintiff
attended a total of five physical therapy sessions, with one
cancellation and one no-show. (Tr. 240, 362). During a session
on January 31, 2006, plaintiff was observed as having poor
posture, decreased lumbar range of motion, increased muscle
guarding and a positive straight leg test at forty degrees. (Tr.
243-44). She was diagnosed with a lumbar and thoracic strain,
and her prognosis was described as "fair 2° chronic nature." Id.
Plaintiff was discharged from physical therapy on March 30, 2006,
after not having attended a session in thirty days. (Tr. 240).
The discharge notice indicates that plaintiff had attained only
twenty-five percent of the therapeutic goals of the treatment.
Id.

Plaintiff continued to undergo primary care treatment at the

Charter Oak Health Center with Christy Fedorwich, PA-C. (Tr. 220-221, 261, 297-98). In progress notes from January 2006 through August 2006, plaintiff's pain was recorded as being at a "0" on a 0-10 scale. (Tr. 220-21, 261). PA-C Fedorwich reported eliciting paraspinal tenderness and a positive straight leg test at greater than forty-five degrees. (Tr. 221). However, she also noted that plaintiff had full range of motion in her trunk and upper and lower extremities; had equal strength bilaterally in her lower extremities; had 2+ patellar reflexes and pegal pulses; and was neurologically intact. (Tr. 220-21, 297-98). PA-C Fedorwich continued to prescribe Plaintiff Neurontin at 300mg and added Motrin at 800mg. (220, 261, 298).

On September 8, 2006, plaintiff underwent a consultative physical examination with Judith Mascolo, M.D. (Tr. 321-22). Dr. Mascolo observed that plaintiff "moved about the room easily and changed positions without evidence of pain" and that her gait was normal and unassisted. (Tr. 322). Dr. Mascolo reported that plaintiff had positive Tinel's and Phalen's signs in both wrists, but also noted that she had 2+ deep tendon reflexes, symmetrical tone, 5/5 strength, and full range of motion in her upper extremities. (Tr. 322). As for plaintiff's lower extremities, Dr. Mascolo found full range of motion in her hips, knees, and ankles; symmetrical tone; 2+ deep tendon reflexes; 4/5 strength; and normal tandem, heel and toe walking. (Tr. 322). Although

plaintiff exhibited tenderness in her lower lumbar and sacral vertebrae and paralumbar muscles, Dr. Mascolo reported that she had full range of motion in her spine in all planes and was able to touch her hand to the floor without any difficulty. (Tr. 322). Dr. Mascolo concluded that: "[t]here is little evidence on [plaintiff's] exam that her back pain impairs her mobility. She did state that she works through her pain. She is able to walk, sit, and stand in one place without any difficulty." (Tr. 322).

Syed Hasan, M.D., examined plaintiff on October 31, 2006. (Tr. 362). Although plaintiff rated her pain at a level of 10/10, Dr. Hasan noted that she appeared "without any obvious discomfort" and that she was "able to ambulate and transfer without any significant protective guarding." Id. Dr. Hasan reported that plaintiff's forward flexion was limited to fifteen centimeters from the floor; that her muscle strength was 5/5 throughout both of her lower extremities; and that her deep tendon reflexes were 2+ and symmetrical bilaterally. (Tr. 363). Additionally, nerve root tension signs including the sitting root and Lasegue's sign were negative bilaterally. Id. Dr. Hasan diagnosed plaintiff with lumbar internal disk disruption syndrome emanating from the L4-5 level and recommended that she undergo bilateral transforaminal injections, which he performed on November 13 and 27, 2006. (Tr. 266-68).

Plaintiff returned to Dr. Hasan in February 2007, and

10

reported that the injections had provided pain relief for only a few days. (Tr. 419-20). Upon examination, Dr. Hasan noted that plaintiff's forward flexion was limited to five centimeters from the floor and her extension was decreased by twenty-five percent. (Tr. 419). Again, plaintiff's muscle strength in her lower extremities was rated 5/5 bilaterally, her deep tendon reflexes were 2+, and nerve root tension signs were negative. Id. Dr. Hasan added facet synovitis at L4-5 and L5-S1 to his diagnosis and recommended that plaintiff undergo medial branch block injections. Tr. 420. Dr. Hasan performed the procedure on April 27, 2007 and explained that the results showed a positive diagnostic left L3 and L4 medial branch block. (Tr. 384-85, 417). He recommended that plaintiff undergo a therapeutic left L4-5 intra-articular steroid injection, which he subsequently performed on May 25, 2007. (Tr. 385).

One month later, plaintiff returned to Dr. Hasan indicating that her pain had not subsided, though she acknowledged that the Neurontin provided some relief and that she was not experiencing any numbness or tingling. (Tr. 380, 382). Dr. Hasan observed that plaintiff displayed no obvious discomfort and was able to ambulate without any significant protective guarding. (Tr. 380). She also displayed full range of forward flexion, though her extension was decreased by twenty-five percent. Id. Lower extremity muscle strength remained at 5/5 bilaterally, deep

tendon reflexes were still 2+ and nerve root tension signs remained negative. Id. Dr. Hasan recommended that plaintiff undergo an MRI of her lumbosacral spine. Id.

The MRI was performed on October 26, 2007 and revealed moderate canal and sever neural foraminal stenosis bilaterally secondary to facet joint degenerative disease with ligamentum flavum hypertrophy and disc bulge at L4-5. (Tr. 411). The MRI also showed mild canal and mild neural foraminal stenosis bilaterally at L3-4 and L5-S1, secondary to the disc bulge and fact joint degenerative disease. Id.

Dr. Hasan again examined plaintiff in January 2008, at which time plaintiff rated her pain at 9/10 and alleged no methods of relief. (Tr. 409.) Again, Dr. Hasan observed plaintiff as being without obvious discomfort and able to ambulate without any significant protective guarding. Id. Forward flexion was limited to twenty centimeters from the floor and extension remained decreased by twenty-five percent. Id. Plaintiff's muscle strength remained at 5/5 bilaterally and her deep tendon reflexes were still 2+. Id. However, Dr. Hasan also noted that nerve root tension signs were positive. Id. Dr. Hasan updated his diagnosis to reflect the findings of the MRI and referred plaintiff to another doctor for possible surgical intervention, specifically a L4-5 decompression. (Tr. 409-410). He opined that if plaintiff was determined not to be a surgical candidate,

futher options included aquatic therapy and chronic pain management from her primary care physician.  (Tr. 410).  There are no records in the transcript of plaintiff pursuing such a referral or treatment, and plaintiff testified that she stopped seeing Dr. Hasan after he informed her that there was nothing else he could do for her.  (Tr. 41).

The transcript does indicate that plaintiff has been treated for asthma.  Records from Charter Oak Health Center, dated September 2005, describe plaintiff's asthma as being "stable" and recommend that she stop smoking.  (Tr. 223).  In April 2006, PA-C Fedorwich noted that plaintiff had no chest pain or shortness of breath other than a regular cough from tobacco use.  (Tr. 297-98).  In September 2006, plaintiff told Dr. Mascolo that she used an Albuterol inhaler two-tree times a week.  (Tr. 321).  Plaintiff did seek treatment for shortness of breath in April 2008, and was diagnosed with moderate persistent asthma.  Tr. 400-401.  Chest x-rays were normal, and plaintiff was prescribed Advair.  (Tr. 400, 407).

2.  Mental Condition

Plaintiff underwent a consultative psychological examination with Michele Krynski, Ph.D., on September 8, 2006.  (Tr. 324-27).  Dr. Krynski described plaintiff's mood as being mildly anxious and mild-moderately depressed.  (Tr. 326).  Dr. Krynski also observed plaintiff's affect as appropriate; her thought

process as rational, relevant, and coherent; her insight was limited; and her social judgment as within normal limits. (Tr. 326). According to Dr. Krynski, plaintiff was fully oriented and was able to provide details of events and present a coherent narrative chronologically. (Tr. 326). Mental status testing revealed that although plaintiff was not malingering, she also did not have a cognitive impairment.

Records from the Charter Oak Health Center indicate that plaintiff was treated for anxiety and depression in October 2007. (Tr. 431). At that time, plaintiff was started on a prescription of Celexa. Id. Treatment notes from April 2008 indicate that plaintiff had been prescribed Effexor and that she reported finding it "very effective" in treating her anxiety and depression. (Tr. 429).

3. State Assessments

Anita Bennet, M.D., a State agency physician, reviewed the medical evidence through September 2006, and provided an assessment of plaintiff's residual functional capacity ("RFC") through that date. (Tr. 339-46). Dr. Bennett opined that plaintiff had the ability to lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; to sit, stand, or walk with normal breaks for a total of six hours each in an eight-hour workday; and to stoop and crouch occasionally. (Tr. 339-43). In explaining her assessment, Dr. Bennett noted that

plaintiff had been treated conservatively from a medication standpoint, and that she had not been compliant with follow-up appointments. (Tr. 346). Dr. Bennett also opined that plaintiff's alleged activities of daily living were not fully credible based on the fact that "there is no objective evidence which would support significant limitations." (Tr. 346). Nathaniel Kaplan, M.D., another State agency physician, who reviewed the medical evidence through at least November 2006, indicated in a January 2007 report that he concurred with Dr. Bennett's RFC assessment. (Tr. 377).

Two agency psychologists also reviewed the medical evidence and assessed plaintiff's mental functioning. (Tr. 348-60, 369). They opined that plaintiff had mild limitations in activities of daily living, social functioning, and concentration, persistence, and pace, and that she had experienced no episodes of decompensation. (Tr. 358, 369).

4. Medical Expert Testimony

Arthur Bovender, M.D., a specialist in orthopedic surgery, testified as a medical expert at plaintiff's hearing. (Tr. 18, 50). Dr. Bovender, who was present for plaintiff's testimony, testified that he had reviewed the medical evidence in the case and acknowledged that plaintiff suffered from chronic low back pain resulting from osteoarthritic changes in the facet joints of the lumbar spine with neural foraminal stenosis. (Tr. 50-51,

53).  He also acknowledged that plaintiff had scoliosis; had tested positive on straight leg raising; and had limited range of motion in her lumbo-sacral spine.  (Tr. 51).  However, Dr. Bovender also explained that the lack of changes in plaintiff's reflexes undermined her claims of pain while sitting, standing, or walking, as well as her alleged need to take more than the usual number of breaks from work.  (Tr. 53-54).

In terms of functional limitations, Dr. Bovender opined that, since March 2005, plaintiff retained the ability to lift ten pounds frequently and twenty pounds occasionally; to sit, stand, or walk for six to eight hours with normal breaks; to climb ramps and stairs; to reach overhead; and to bend, stoop, squat, and kneel occasionally.  (Tr. 52-53).  Dr. Bovender further stated that plaintiff was unable to crawl or climb scaffolds, ramps or stairs.  (Tr. 52).

B.  PLAINTIFF'S SUBJECTIVE COMPLAINTS

In "Activities of Daily Living" forms dated August 21, 2006, and January 5, 2007, plaintiff indicated that she shared an apartment with her boyfriend; that she prepared her own meals twice a week; and that she spent two hours twice a week cleaning with her boyfriend's help.  (Tr. 156, 158-59, 182, 184-85).  She also reported that she was able to go out alone; that she went shopping once a month for two hours at a time; and that she would walk or take public transportation.  (Tr. 159, 160, 185-86).

Plaintiff denied experiencing any unusual fears.  (Tr. 162).
Plaintiff also reported these activities of daily living to the
two consultative examiners, Drs. Mascolo and Krynski.  (Tr. 321,
325).

At her hearing, plaintiff testified that she did not do any
cleaning or shopping and that she cooked only once a week.  (Tr.
35, 43).  She also explained that she was scared to go outside,
especially when she was alone, but acknowledged that she would go
out more often if she had access to a car and money.  (Tr. 45,
47).  She testified that she spent her days watching television,
listening to the radio, or visiting a friend.  (Tr. 36).
Plaintiff described her back pain as going down her spine and
lower back and her legs feel weak, tired and painful.  She also
testified that she has trouble with her hands and with standing
and that her back and leg hurt.  (Tr. 17).

Plaintiff rated her constant back pain at a 9 on a scale of
1-10.  (Tr. 31, 44).  She also testified that she experienced
weakness and pain in her legs and pain and numbness in her hands.
(Tr. 31, 48).  Plaintiff denied that she was able to obtain pain
relief, either from the Neurontin or from any particular posture.
(Tr. 32, 34).  She explained that she was able to walk one city
block before having to rest; that she could stand in one place
for 15 to 20 minutes at a time; and that she could sit for
between 30 and 45 minutes at a time.  (Tr. 34).  She also

testified that she had difficulty climbing stairs; could lift and carry up to five pounds; was unable to push/pull much; and was unable to raise her arms to lift items above her head. (Tr 37, 41-42). Additionally, Plaintiff reported that climbing and exposure to heat and fumes caused her difficulty breathing, for which she used her inhaler. (Tr. 37-42).

Although plaintiff testified that she did not sleep well, she also reported that the Neurontin made her sleepy. (Tr. 32, 33). Plaintiff also asserted that she had never been able to hold a job for more than five months because she could not stand for long periods of time and required too many breaks. (Tr. 29). She described a previous job in which she allegedly took 10-15 minute breaks 3-4 times an hour. (Tr. 30).

C.   PLAINTIFF'S CLAIMS

Plaintiff contends that the ALJ made several crucial errors in denying her Disability Insurance Benefit ("DIB") claim. First, plaintiff claims that the ALJ committed legal error in her evaluation of plaintiff's credibility by failing to follow the requirements of SSR 96-7p and that her determination of the plaintiff's credibility was not supported by substantial evidence. Social Security Ruling ("SSR") 96-7p, 1996 WL 374186(S.S.A. July 2, 1996). Second, plaintiff claims that the ALJ erred by assigning "great weight" to the opinion testimony of a medical expert.

1.  <u>ALJ's Ruling</u>

In her ruling, the ALJ followed the SSA's five-step
sequential analysis.  First, she found that plaintiff has not
engaged in substantial gainful activity since March 2005.  (Tr.
15).

Pursuant to step two, she found that "the claimant has the
following severe impairments: degenerative disc disease (DDD),
asthma and bilateral carpal tunnel syndrome (CTS)."  <u>Id.</u>
Specifically, the ALJ found that a March 2, 2005 MRI of
plaintiff's lumbar spine showed evidence of a small central disc
protrusion at L4-5 with evidence of an annular tear.  The MRI
also showed mild central stenosis at this level from the disc as
well as posterior degenerative changes and physical therapy was
recommended.  The ALJ relied on treatment notes dated January 4,
2008 that revealed that plaintiff underwent another MRI of the
lumbar spine on October 26, 2007, which showed spondylitic
changes causing moderate central and severe bilateral foraminal
stenosis at the L4-L5 level along with mild central and bilateral
foraminal stenosis at the L5-S1 level.  Examination notes
indicated that plaintiff was without any obvious discomfort and
able to ambulate and transfer without any significant protective
guarding.  Examination of the lumbosacral spine revealed forward
flexion to 20cm from the floor, and extension decreased by 25%.
The nerve root tension sign including the sitting root and

Lasegue's were positive bilaterally.  Finally, upon manual muscle testing, she had muscle strength of 5/5 in all muscle groups in bilateral lower extremities.

Additionally, plaintiff's depression and anxiety were under control with medication and did not cause more than minimal limitation in her ability to perform basic mental work activities and her condition is therefore non-severe.  In making this finding, the ALJ considered four broad functional areas set out in the disability regulations for evaluating mental disorders and in Section 12.00C of the Listing of Impairments.  20 C.F.R., Part 404, Subpart P, Appendix 1.  These four broad functional areas are known as "paragraph B" criteria.  The first functional area is activities of daily living.  In this area, the ALJ found that plaintiff has no limitation; the claimant's depression and anxiety do not impede her activities of daily living.  In the next functional area, social functioning, the ALJ found no limitation. For the third functional area, concentration, persistence or pace, the ALJ found no limitations. Finally, the ALJ found that plaintiff has not experienced any episodes of decompensation of extended duration.  Accordingly, since plaintiff's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and no episodes of decompensation of extended duration, it is nonsevere.  20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).

The ALJ found that the plaintiff does not have an impairment
or combination of impairments that meet or medically equals one
of the listed impairments in 20 C.F.R. Part 404, Subpart P,
Appendix 1.  (Tr. 16).  Specifically, the ALJ found that
plaintiff does not have sufficiently severe objective findings or
functional limitations to meet or equal the requirements of
listing 1.04[2] *et seq* and her depression and anxiety are non-
severe impairments.  Expert witness, Arthur Brovender, M.D.,
testified that plaintiff has degenerative disc disease,
osteoarthritis, and facet arthritis, but she has no atrophy,
muscle weakness or sensory loss, as required by Listing 1.04.
She only had occasional difficulty with straight leg raising.

At step four, after careful consideration of the entire
record, the ALJ found that plaintiff had the residual functional
capacity to lift 10 pounds frequently and 20 pounds occasionally;

---

[2] 1.04 *Disorders of the Spine* (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal
stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in
compromise of a nerve root (including the cauda equina) or the spinal cord.  With: A. Evidence
of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of
motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness)
accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive
straight-leg raising test (sitting and supine); or B. Spinal arachnoiditis, confirmed by an operative
note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging,
manifested by severe burning or painful dysesthesia, resulting in the need for changes in position
or posture more than once every 2 hours; or C. Lumbar spinal stenosis resulting in
pseudoclaudication, established by findings on appropriate medically acceptable imaging,
manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate
effectively, as defined in 1.00B2b.

to sit, stand, and walk for 8 hours with normal breaks; she can occasionally stoop, kneel, and crouch; she cannot crawl or climb ladders; she cannot do fine finger manipulation; and she cannot have concentrated exposure to fumes, dust or irritants.

The ALJ then discussed the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and Social Security Ruling ("SSR") 96-4p and 96-7p. (Tr. 17). The ALJ also considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. Id.

The ALJ considered all of the evidence, in the form of objective medical evidence from sources who treated and examined plaintiff, assessments from state agency physicians and psychologists, and plaintiff's testimony. (Tr. 16-19).

At step five, considering the plaintiff's age, education, work experience, and residual functional capacity, the ALJ found that there are jobs that exist in significant numbers in the national economy that plaintiff can perform. 20 C.F.R. §§ 404.1569, 404.1569a, 416.969 and 416.969a. The ALJ found that plaintiff was born on July 19, 1968 and was 36 years old on the alleged disability onset date, which is defined as a younger individual, aged 18-44. 20 C.F.R. §§ 404.1563 and 416.963. Plaintiff has a limited education and is able to communicate in

English.  20 C.F.R. §§ 404.1564 and 416.964.  Additionally, because plaintiff had no past relevant work, transferability of job skills is not an issue.  20 C.F.R. §§ 404.1568 and 416.968.

In determining whether a successful adjustment to other work can be made, the ALJ must consider plaintiff's RFC, age, education and work experience in conjunction with the Medical-Vocational Guidelines.  20 C.F.R. Part 404, Subpart P, Appendix 2.  Based on a RFC for light work, considering plaintiff's age, education and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 202.17.  However, because additional restrictions prevent plaintiff from doing full range of light work, a Vocational Expert, Dr. Sachs, was consulted.

In response to a hypothetical question that assumed the existence of an individual of plaintiff's age, education and RFC, Dr. Sachs testified that such an individual would be able to perform the requirements of occupations such as a hand packer at a light unskilled level with 1,500 positions within the region and 150,000 positions nationwide.  (Tr. 55-56).  Other occupations the hypothetical individual would be able to perform would be production inspector with 1,200 positions within the region and 100,000 positions nationally, and packing and filling machine operator with 900 positions regionally and 130,000 positions nationwide.  (Tr. 56-57).  Dr. Sachs testified that, based on his professional experience, the numbers he cited

represent only those positions that do not involve fine manipulation. (Tr. 56). The ALJ found the hypothetical individual to accurately describe an individual of the plaintiff's vocational background and functional limitations, and that the numbers cited represent a significant number of jobs in the economy. (Tr. 57).

2. Plaintiff's Credibility

The function of the Commissioner includes evaluating the credibility of all witnesses, including the claimant. See Carroll v. Secretary of HHS, 705 F.2d 638, 642 (2d Cir. 1983). Although the Commissioner is free to accept or reject the testimony of any witness, a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing Carroll, 705 F.2d at 643). Further, the ALJ's findings must be consistent with the other evidence in the case. Id. at 261.

In making a disability determination, all symptoms, including pain, must be considered. 20 C.F.R. § 404.1529(a). In evaluating subjective symptoms, a claimant's statements are to be considered only to the extent that they are consistent with medical evidence. 20 C.F.R. §§ 404.1529(a), 416.929(a). The claimant's allegations need not be substantiated by medical

24

evidence, simply consistent with it.  Youney v. Barnhart, 280
F. Supp. 2d 52, n.4 (W.D.N.Y. 2003).

If the claimant demonstrates the existence of a medically
determinable impairment that could reasonably be expected to
produce the symptoms, the Commissioner must evaluate the
intensity, persistence and functionally limiting effects of the
symptoms based on all available evidence. See SSR 96-7p, 1996 WL
374186, at *1-2 (S.S.A. July 2, 1996).  This requires the
adjudicator to make a finding about the credibility of the
individual's statements about the symptoms and their functional
effects.  Id.  However, statements about the intensity and
persistence of pain and symptoms will not be rejected simply
because the objective medical evidence does not support the
claim.  20 C.F.R. § 404.1529(c)(2).  Other factors which will be
considered include the claimant's medical history, diagnoses,
daily activities, prescribed treatments, efforts to work, and any
functional limitations or restrictions caused by the symptoms.
See 20 C.F.R. § 404.1529(c)(3).  In addition,

> [w]hen evaluating the credibility of an individual's
> statements, the adjudicator must consider the entire
> case record and give specific reasons for the weight
> given to the individual's statements.
>
> The finding on the credibility of the individual's
> statements cannot be based on an intangible or
> intuitive notion about an individual's credibility.
> The reasons for the credibility finding must be
> grounded in the evidence and articulated in the
> determination or decision.  It is not sufficient to
> make a conclusory statement that "the individual's

allegations have been considered" or that "the
allegations are (or are not) credible." It is also not
enough for the adjudicator simply to recite that
factors that are described in the regulations for
evaluating symptoms.  The determination or decision
must contain specific reasons for the finding on
credibility, supported by evidence in the case record,
and must be sufficiently specific to make clear to the
individual and to any subsequent reviewers the weight
the adjudicator gave to the individual's statements and
the reasons for that weight.

SSR 96-7p, 1996 WL 374186, at *4.

Here, the plaintiff has argued that ALJ's credibility
assessment was improper because she failed to consider the rules
and regulations in evaluating a claimant's own statement about
pain.  Plf's. Memo. at 11. It appears plaintiff is arguing there
must be a lengthy discussion in assessing credibility, including
an analysis of seven factors ranging from the individual's daily
activities to treatment and medication.

While these factors are relevant to the evaluation, they are
not a rigid seven step prerequisite to the ALJ's finding.  Snyder
v. Barnhart, 323 F. Supp. 2d 542, 546 (S.D.N.Y. 2004).  Rather,
the predominate focus must be on the entire record as a whole.
Id.  As stated, the decision must contain specific reasons for
the findings on credibility, supported by the evidence in the
case record, and must be sufficiently specific to make clear to
the individual and to any subsequent reviewers the weight the
adjudicator gave to the individual's statements and the reasons
for that weight.  See SSR 96-7p, 1996 WL 374186, at *4.

In this case, the ALJ made specific findings as to plaintiff's credibility.  The ALJ assessed the credibility of Plaintiff's subjective complaints and weighed them against the medical record.  Specifically, the ALJ found that plaintiff's testimony concerning the intensity, persistence and limiting effects of these symptoms is not credible to the extent the testimony is inconsistent with the above residual functional capacity assessment.  In making this credibility finding, the ALJ recounted plaintiff's testimony regarding her activities of daily living as well as the location, intensity, persistence, and limiting effects of her pain.  (Tr. 17-18).  However, consistent with the regulations and with the testimony of the medical expert, Dr. Bovender, the ALJ found that plaintiff's allegations were belied by the limited objective medical findings.  (Tr. 18, 51-54).  See 20 C.F.R. § 416.929(c)(2).  The ALJ explained that although these findings revealed some abnormal straight leg raising and mild limitation of motion in the spine, they did not show any atrophy, loss of strength, loss of sensation or reflex abnormalities.  (Tr. 18).

The ALJ further noted that none of plaintiff's treating or examining sources had limited her activities or otherwise endorsed her alleged functional limitations.  (Tr. 18).  Dr. Mascolo, the consultative examiner, opined that there was "little evidence" that plaintiff's back pain impaired her mobility and

concluded that she could walk, sit, and stand in one place "without any difficulty." (Tr. 322). The ALJ also based her credibility finding on plaintiff's medication regime and other course of treatment. (Tr. 18), See id. § 416.929(c)(3). The ALJ noted that "although epidural injections have not helped much, the claimant has not pursued further options or pain management." (Tr. 18). The ALJ also noted that none of plaintiff's treating or examining sources have limited her activities. Further, regarding her allegations of carpal tunnel syndrome[3] being disabling, "she has received no continued treatment for her alleged symptoms." Id.

At the hearing, Dr. Brovender testified that the plaintiff should be able to handle the activities in the RFC determined by the ALJ. In addition, Dr. Brovender indicated that there would be no reaching limitations because there was no follow-up evidence regarding her carpal tunnel syndrome. Id. When questioned about the need for frequent breaks, Dr. Brovender opined they would not be necessary, because the claimant demonstrated no reflex changes. Id.

Plaintiff argues that the ALJ based her determination that plaintiff could work on the testimony that she spent a typical day at home watching television or visiting a friend. Pl's Memo.

---

[3] In her ruling, the ALJ abbreviated carpal tunnel syndrome as "CTS."

at 12-13.  The ALJ recited the plaintiff's daily activity that she testified to, but did not comment on its veracity or its probativeness.  As discussed above, the ALJ based her credibility finding on the relatively benign objective medical findings, as described by the medical expert, as well as plaintiff's limited course of treatment.  (Tr. 18).

Plaintiff also contends that the ALJ mischaracterized the medical evidence by stating that plaintiff "sometimes" had abnormal straight leg raising.  Pl's Memo. at 15.  While not a model of clarity, the ALJ's statement accurately reflects the medical records and does not mischaracterize the evidence. Plaintiff's medical records show that she had tested positive on the straight leg test on three occasions.  (Tr. 218, 244, 298.) Notes from at least eight other examinations are silent as to the straight leg raise, suggesting either that such testing was not performed or, if it was, that the results were negative.  (Tr. 221, 224, 226, 321-22, 362-63, 380, 409-10, 419).  In any event, the ALJ did not make a speculative finding that plaintiff had any negative straight leg tests.

Plaintiff also disputes the ALJ's statement that she was not taking any "strong" pain medication.  Pl's Memo. at 14-16.  The ALJ's statement is supported by Dr. Bennett, the State agency physician, who opined that plaintiff had been treated conservatively from a medication standpoint.  (Tr. 346).

Moreover, the assessment is also consistent with medical literature concerning the type and dosage of this medication. See The Merck Manual, 1771, 1777 (18th ed. 2006). Additionally, plaintiff's allegation that Neurontin was ineffective in treating her pain and had disabling side-effects is undermined by the fact that her treating physicians and PA-Cs continued to prescribe it for her, with no apparent restriction in her activities, from at least April 2005 through her September 2008 hearing. (Tr. 32, 404).

The ALJ's discussion of plaintiff's other treatment is supported by substantial evidence. First, the ALJ's acknowledgment that plaintiff had undergone epidural injections and that they had not helped much is consistent with the medical records and plaintiff's reports that the injections had failed to provide lasting pain relief. (Tr. 18, 380, 419-20). The ALJ's subsequent statement that plaintiff had not pursued further options or pain management beyond those injections is also consistent with the medical evidence. In January 2008, following the multiple unsuccessful epidural injections, Dr. Hasan indicated that he would refer plaintiff to another doctor for potential surgical intervention and also opined that other options included aquatic therapy and chronic pain management from her primary care physician. (Tr. 409-10). However, there are no medical records of plaintiff pursuing any of these options and

plaintiff's attorney did not indicate at the September 2008 hearing that such records existed. (Tr. 24). Additionally, plaintiff testified that she had discontinued treatment with Dr. Hasan, and she did not indicate that she had pursued the options recommended by him. (Tr. 41). See <u>Arnone v. Bowen</u>, 882 F.2d 34, 39 (2d Cir. 1989)(holding that the Commissioner may "properly attribute significance to [the claimant's] failure to seek medical attention..." in evaluating the claimant's credibility). Plaintiff's assertion that she pursued treatment consistently and aggressively and that she is following her doctors' treatment recommendations is not supported by the medical evidence.

The plaintiff argues that the ALJ failed to discuss the fact that she underwent physical therapy in January 2006. The Commissioner agrees; however, he argues that the evidence relating to plaintiff's limited course of physical therapy actually undermines her credibility. In December 2005, Dr. Beck, the examining physiatrist, had advised plaintiff to undergo physical therapy two-three times a week for six weeks. (Tr. 218). Plaintiff's physical therapy records reveal that she attended a total of five sessions, with one cancellation and one no-show. (Tr. 240, 362). Also, notes from PA-C Burns indicate that plaintiff had twice missed consultative orthopedic appointments in 2005 and had declined a recommended prescription of Flexeril.

Plaintiff argues that the ALJ erred by not acknowledging the consistency of her subjective complaints over time. Pl's Memo. at 16. Plaintiff is correct that the ALJ was required to consider the internal consistency of her statements as a factor in assessing her credibility. See SSR 96-7p. However, the absence of an articulated finding as to the internal consistency does not mean that the ALJ did not consider it and find it to be outweighed by other factors. See Mongeur, 722 F.2d at 1040; Id. The Commissioner points out that plaintiff's testimony is not entirely consistent with her previous statements. For example, plaintiff's earlier reports that she shopped and cleaned undermined her testimony that she did neither of those activities and plaintiff's testimony that she was "scared" to go outside is inconsistent with her earlier denials of experiencing any unusual fears, and the discrepancy is not explained by any medical evidence indicating that her anxiety worsened in the interim. (Tr. 45).

Similarly, plaintiff claims that the ALJ erred by not addressing observations made by a Social Security field office employee in March 2006, that plaintiff had difficulty sitting and standing during an interview. (Tr. 16-17). However, this observation is directly contradicted by the observations of a trained physician, Dr. Mascolo, who observed that plaintiff "moved about the room easily and changed positions without

evidence of pain," six months later.  (Tr. 322).  Likewise, Dr. Hasan noted on multiple occasions that plaintiff appeared "without any obvious discomfort" and was "able to ambulate and transfer without any significant protective guarding."  (Tr. 362, 380, 409).

3.  Opinion of Medical Expert

Plaintiff argues that the ALJ erred in assigning "great weight" to the opinion of the medical expert, Dr. Bovender, because he had not examined plaintiff and because his opinion is inconsistent with the other evidence of record.  Pl's Memo. at 17-19.

Among the factors that an ALJ should consider in evaluating a non-treating medical source opinion are: the degree to which it is supported by medical signs and laboratory findings; its consistency with the rest of the administrative record; and the relevant specialization of the medical source.  See 20 C.F.R. § 401.927(d)(ii)(3)-(5), (f).  These factors being equal, an ALJ will generally give greater weight to the opinion of an examining source than to that of a non-examining source.  See id. § 401.927(d)(1).  However, an ALJ may rely upon the opinions of State agency medical consultants, as these consultants are deemed qualified experts in the field of social security disability. See 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b)(6), 416.913(c), 416.927(f)(2). When the consultant's

opinions are supported by other facts in the record, they provide substantial evidence for the ALJ's findings. See 20 C.F.R. § 416.927(f)

Accordingly, the mere fact that Dr. Bovender did not examine plaintiff did not require the ALJ to accord his opinion less weight. Dr. Bovender testified that he had familiarized himself with the case by reviewing the medical evidence of record and listening to plaintiff's testimony regarding her symptoms and their alleged limiting effects. (Tr. 50). Dr. Bovender is a specialist in orthopedic surgery and as such was well-positioned to opine on plaintiff's musculoskeletal conditions and their functional limitations. (Tr. 50). See 20 C.F.R. § 416.927(d)(ii)(5). Dr. Bovender supported his RFC assessment by citing to medical findings in the record, which showed that although plaintiff had limited range of motion in her lumbar spine from osteoarthritis, facet arthritis, and stenosis, she had no atrophy, muscle weakness or sensory loss. (Tr. 51-53). Dr. Bovender also cited to the fact that plaintiff did not have reflex changes to support his opinion that she would not experience such pain from sitting, standing or walking as to require her to take more than the usual number of work breaks. (Tr. 53-54); See 20 C.F.R. § 416.927(d)(ii)(3).

The ALJ gave great weight to Dr. Brovender's opinion because he is a specialist in orthopedics, reviewed the entire medical

record and listened to claimaint's testimony.  Additionally, none
of the plaintiff's treating sources submitted opinions on her
condition or limitations.  (Tr. 18).

Dr. Bovender's opinion is consistent with the other evidence
of record, including the medical opinion of Dr. Mascolo, who
examined plaintiff, found that there was "little evidence" that
her back pain impaired her mobility, and concluded that she could
walk, sit, and stand in one place "without any difficulty."  (Tr.
322).  See id. § 416.927(d)(ii)(4).  Dr. Bovender's RFC
assessment is even more restrictive, in plaintiff's favor, than
those of the State agency physicians, who opined that plaintiff
could lift and/or carry fifty pounds occasionally and twenty-five
pounds frequently.  (Tr. 339-43, 377).  Importantly, there is no
medical opinion in the evidence that suggests that plaintiff had
greater functional limitations than those identified by Dr.
Bovender and adopted by the ALJ.

VI.  Conclusion

After carefully examining the administrative record, the
Court finds that substantial evidence supports the ALJ's
decision, including the objective medical evidence and supported
medical opinions. It is clear to the Court that the ALJ
thoroughly examined the record, afforded appropriate weight to
the medical evidence, and afforded plaintiff's subjective claims
of pain and other limitations an appropriate weight when

rendering her decision that plaintiff is not disabled. Because the Court finds that substantial evidence supports the ALJ's decision, Plaintiff's Motion for an Order Reversing the Decision of the Commissioner **[Doc. #12]** is **DENIED**, Plaintiff's Motion for an Order to Remand to Agency **[Doc. #13]** is **DENIED** and Defendant's Motion to Affirm the Decision of the Commissioner is **[Doc. #18]** is **GRANTED**.

Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this order. Failure to object within fourteen (14) days may preclude appellate review. <u>See</u> 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 2 of the Local Rules for United States Magistrates; <u>Small v. Secretary of H.H.S.</u>, 892 F.2d 15 (2d Cir. 1989)(per curiam); <u>FDIC v. Hillcrest Assoc.</u>, 66 F.3d 566, 569 (2d Cir. 1995).

ENTERED at Bridgeport this 24th day of September 2010.

_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE